MARY ANN BEARD, EXC'X OF WM. BEARD vs. EDWARD
HUBBLE AND OTHERS.—December 1850.

A party who seeks relief in equity upon the ground of mistake, must pro-
duce proof clear and overwhelming of the existence of such mistake.

In all cases of mistake it is required that the party injured by the mistake,
should take steps promptly to get relief, and if he is guilty of *laches*, he can-
not complain if by reason thereof, he is a sufferer.

The complainant gave his note on the 16th of March 1840, to the testator of
one of the defendants, and on the 10th of August of the same year con-
fessed judgment thereon, which in 1845 was entered satisfied, and on the
same day a new judgment was confessed for the amount of the old one,
with interest then due thereon. In 1846 this judgment was assigned and
entered for the use of the assignee. In 1847 the complainant, the judgment
debtor, made a considerable payment to the administrator of the assignee,
who afterwards assigned it to the defendant. The complainant then filed
his bill in equity, asking relief on the ground that the note and original
judgment were founded in mistake. The proof of mistake was not clear
and satisfactory, and it was HELD: that the complainant was not entitled
to relief, and that the assignees of the judgment have a superior equity to
any that the complainant has been able to show.

APPEAL from the equity side of *Washington county* court.

The bill in this case was originally filed by the testator of
the appellant against the appellees. The allegations of the
bill and answers, and all the facts of the case, are very fully
stated in the following opinion of the court below, delivered
by his honor, judge MARSHALL.

"The object of the bill filed in this cause, is to obtain a
perpetual injunction upon a judgment against the complain-
ant, in favor of a certain *Jacob Brewer of J.*, now deceased,
for $2179.19, with interest from the 25th of August, 1845.
The judgment was signed in *Washington* county court, on
the 8th of September 1845. The bill charges that the note
upon which the judgment was rendered, and the judgment it-
self was founded in mistake. That at the time the note was
given, and at the time the judgment was rendered, the com-
plainant in fact owed the said *Jacob Brewer* nothing. The
answer of each and all the defendants, deny all knowledge of
any mistake in the said note or judgment and *John A. K. Brew-*

er, the administrator of *Jacob Brewer of J.*, expresses his belief that there was no mistake in the said note or judgment. The complainant, upon the answers of the defendants, is left to make out his case by such proof as he can produce for the consideration of the court.

In the argument of this cause no question was raised as to the jurisdiction of this court, founded in mistake, when the mistake is charged in the bill, and if raised would not at this day deserve a moment's consideration. Neither was it denied that in equity, upon a charge of mistake in a written contract, deed, bond, note, judgment, &c., that parol evidence was admissible to reform or correct the mistake. But while these plain propositions were fully admitted, it was urged with great propriety, that all cases in which a court of equity admits parol evidence to vary and reform written contracts or instruments, upon a charge of fraud, accident or mistake, are exceptions to the general rule which excludes parol evidence for such a purpose, and that therefore, when relief is sought upon the *strength of parol proof*, the mistake charged in the bill must be a *plain mistake clearly made out*, entirely to the satisfaction of the court.

The question for consideration at this stage of the inquiry is, what amount of proof will authorise a court of equity to administer relief, where the complainant in his bill seeks to correct or reform a written contract, note or judgment, &c., upon the strength of parol proof? In *Henkle vs. The Royal Exchange Assurance Company*, 1 *Vez.*, 317, *Lord Hardwicke* said: "The court of chancery had jurisdiction to relieve in respect to a *plain mistake;*" and again he said: "It must be proper proof and the *strongest possible* proof." *Lord Thurlow in Irnham vs. Child*, 1*st Bro. Ch. Rep.*, 94, said, that "a mistake creating an equity *dehors* the deed, should be proved as much to the satisfaction of the court as if it were *admitted.*" *Lord Eldon* in the case of *The Marquis of Townsend vs. Stangroom*, 6 *Vez.* 328, stated, " that those who undertook to rectify an agreement by showing a mistake by parol proof undertook a task of great difficulty." Here then we have the con-

current judgment of three of *England's* ablest and most distinguished chancellors, to the effect that where a written contract of any character is sought to be corrected, or reformed, by the force of parol evidence, the proof must be of the strongest and most demonstrative character. In one of the cases *Lord Thurlow* said, "that there is no instance of such testimony prevailing, in which the party against whom the mistake is sought to be corrected denies the existence of it." This proposition chancellor *Kent,* in the case of *Gillespie vs. Moon,* 2 *Johns. Ch. Rep.,* 585, controverts. He maintains in that case, "that the answer denying the mistake charged in the bill is to be received as evidence, and to have the same weight as in all other cases, but subject to be overcome by the strength of *parol* evidence, under the established rules of evidence in chancery." This view of the chancellor appears to be sensible and it is apprehended to be the sound rule in chancery. But admit this to be the case, still the chancellor, although he granted relief in that case against the answer of the defendant, did not pretend to deny the propriety of the rule requiring great strictness of proof; so far from it, he manifestly adopts the justice and propriety of the rule. The relief was granted in that case, as he states in his own language, upon proof "*clear* and overwhelming." That this was his view in that case is clear from the language he employs in the case of *Lyman vs. The United States Insurance Company,* 2 *Johns. Ch. Rep.,* 630, decided shortly after. In this case the chancellor says, "the difficulty in this case arises from want of requisite evidence," &c. "The cases which treat of this head of equity jurisdiction, require the *mistake* to be *made out* in the most *clear and decided manner,* and to the *entire satisfaction* of the court." The authorities were reviewed in the decision of the case of *Gillespie vs. Moon,* and a reference was made to the successive opinions of *Lords Hardwicke, Thurlow* and *Eldon,* in favor of the most "*demonstrative proof.*"

This view, as to the amount of evidence required in such cases, appears to have been adopted by the *Maryland* courts. In the case of *Watkins and Stockett,* 6 *H. & J.,* 435, chan-

cellor *Johnson* expresses himself in the following manner: "When men of sufficient understanding come to a settlement of their various transactions, and enter into solemn instruments of writing, purporting to settle the amount *due* from *one* to the *other*, such adjustment should not be shaken, except upon the most *irrefragable proof;*" and at another part of his opinion, " by *evidence clear* and *incontrovertible.*" In the same case, *Judge Archer* adopts the language of *Lord Thurlow,* that the proof of the mistake should be established, " as much to the *satisfaction* of the court, as if it were admitted, and that the difficulty of doing this is so great, that there is no instance of its prevailing against a party insisting there is no mistake." Upon the strength of authority, the rule must be received as well established, that where a party files his bill in chancery, charging a mistake in a written contract, note, judgment, &c., and seeks relief from such alleged mistake by the force of parol evidence, he must make out a *plain mistake,* and sustain it to the *entire* satisfaction of the court, by the most *demonstrative evidence.*

The difficulty in this case is not to be found in any doubtful rule of law, but the difficulty, (if in truth it can be said there is any,) lies in the strength and character of the proof by which the mistake charged in the bill is sought to be established. The question, then, for the consideration of this court is, does the proof establish a *plain mistake* by *evidence,* clear and demonstrative, to the entire *satisfaction* of the court? The solution of this question must depend upon the facts and circumstances disclosed by the proof in the case.

What are these facts and circumstances as they are found in the record? They will now be examined. On the 16th day of March, 1840, the complainant gave his promissory note to *Jacob Brewer* of *J.,* for $1744 89. On the 10th of April, 1840, he paid on the said note, $100. On the 17th of August, 1840, the complainant confessed judgment on the said note in *Washington* county court, in favor of *Brewer.* On the 8th of September, 1845, this judgment was, by the agreement of the parties, entered satisfied, and a new judgment for the same

debt, embracing the accumulated interest, was confessed on the same day, in favor of the said *Brewer*, for $2179.19, bearing interest from the 25th of August, 1845, with a stay of two years, and all errors released. *Jacob Brewer*, in his lifetime, on the 30th of July, 1846, assigned the last named judgment to *Jacob Snyder*, and guaranteed its payment, and it was entered for his use. *Snyder* afterwards died, and on the 8th of May, 1847, and sometime after the death of *Jacob Brewer*, the complainant paid to *John M. Snyder*, the administrator of *Jacob Snyder*, $550, in part of the said judgment. On the 30th of April, 1847, *John M. Snyder*, the administrator of *John*, assigned the said judgment to the amount of $1850, to *Edward Hubble*. *Jacob Brewer* of *J.*, died in the autumn of 1846. That sometime previous to the death of *Jacob Brewer* of *J.*, the complainant admitted his indebtedness to him, in the year 1842, in the amount of the judgment, or nearly so, in the presence of *Thomas Draper*, a witness examined in this cause. After all these repeated recognitions of the debt due by him to the said *Jacob Brewer*, which forms the consideration of the note of the 16th of March, 1840, and of the judgment of the 8th of September, 1845, and after the death of *Jacob Brewer* of *J.*, the complainant files his bill in this court, on the 7th of September, 1847, charging, that the note of the 16th of March, 1840, and the judgment of the 8th of September, 1845, were erroneous, and originated in mistake, and invokes the equitable power of the court to enjoin the execution of the said judgment, upon the ground, that nothing in fact was due to the said *Jacob Brewer* of *J.*, at the time the note was given, or at the time of the rendition of the said judgment. But how is this mistake made to appear? It is alleged in the bill, that the complainant purchased that part of the real estate of *John Brewer*, deceased, which he devised to his son *Adam Brewer*; and by this means, fell in debt to *Jacob Brewer* of *J.*, the representative of the estate, to the amount of $10,526.60. That independent of this debt, the complainant owed nothing to *Jacob Brewer* of *J.*, with the exception of a small account which still remains due and unpaid. The bill then charges, that said

*Jacob Brewer*, as the legal representative of the estates of *John Brewer*, *Jr.*, *Adam Brewer* and *Matilda Brewer*, upon the distribution thereof in the orphans court of *Washington* county, fell in debt to the complainant, in right of his wife, who was one of the distributees of said estates, to the amount of $4,234.12; that this sum, deducted from the $10,526.60, the amount of complainant's purchase, left the complainant in debt to *Jacob Brewer* of *J.*, in the amount of $6,291.48. That on the 1st of March, 1837, the distributees had a settlement of the amounts due them from *Jacob Brewer* of *J.*, upon the distribution of the assets of the said estates in the orphans court of *Washington* county. That upon this settlement, it was ascertained, that *John H. Huyett*, who married *Catharine Brewer*, one of the defendants, was entitled to the sum of $2,760.48, and that *Elizabeth Brewer*, another of the distributees, was entitled to the sum of $3,465.62. That upon this ascertainment, it was agreed between the parties, that the complainant should become responsible to these two distributees for the amount due them, and by this mode liquidate the amount due them on the distribution of the aforesaid estates, and at the same time discharge his debt, *pro tanto*, due upon the purchase of said land. That in conformity to this arrangement, the complainant did, on the said first of March, 1837, give his notes to the said distributees, for the amount due them, with *Jacob Brewer* of *J.*, as one of his securities in the said notes; which said notes have been paid in part, and the balance secured by a judgment. That by this arrangement, the whole amount of complainant's debt upon the purchase of the land had been paid, with the exception of a small balance of $65.39.

These facts, as set forth in the bill of complaint, so far as they relate to the amount due the complainant upon the distribution of the said estates and the arrangement entered into by the parties on the 1st of March, 1839, fully and satisfactorily appear from the accounts and distributions filed in this cause, and the written admissions of the counsel of the complainant, and defendants, also filed in the case. If, therefore, it can be shown to the satisfaction of the court, that the note of the 16th

54    v.9

of March, 1840, for $1,744.89, was given as the consideration in part for the said land purchased by the complainant, then a clear and palpable mistake will be made out fully to the satisfaction of this court. But how does it appear that the note was given in part of the consideration for the said land? For the purpose, and with a view of establishing this fact, the parol testimony of *Mrs. McRea* is introduced, who states, that some time in the year 1845 or 1846, *Jacob Brewer* came to her house for the purpose of signing with her three deeds. That in the course of conversation, *Brewer* stated, that *Beard* owed him near $2,000. The witness asked him how *Beard* came to get so much in debt to him? *Brewer* replied, that he and *Beard* had not had dealings together; that this debt came out of the land; that *John Huyett* was not willing to take all his portion out of the land, but that he, *Brewer*, was no way afraid, and would take all his out of the land. The witness states, that the land referred to was the land which the complainant had purchased. Now if these declarations of *Jacob Brewer* of *J.*, are truly remembered and correctly represented, of what value are they in establishing the mistake charged in the bill? They are certainly very loose and unsatisfactory in connexion with the circumstances disclosed in the record. How could it be that *Huyett* had refused to take all the remaining portion of his distributive share in the estates, when the facts stated in the complainant's bill, and the admissions and proof in the cause abundantly prove that he had actually done so? And how could *Jacob Brewer* be willing to receive his portion out of a fund he knew not to be due? At all events it is clear, the note could not have been given in part of the consideration for the land, and at the time it was given neither *Jacob Brewer* of *J.*, nor the complainant could have so understood it; for as early as the 1st of March, 1837, the land had been settled for, and the fact was known to both parties. But the idea that the note was given in part of the consideration for the land, is incompatible with the theory of the complainant's bill. The bill proceeds upon the ground, that on the 16th of March, 1840, the complainant not being indebted to *Jacob Brewer* of *J.*, was in-

duced by him to give him the note in question, upon a representation made by the said *Brewer,* that the note was required either for a part of his, *Jacob's,* share in his father's estate, or for a debt due him from his father's estate. This charge in the bill clearly demonstrates, that at the time the note was given, it was not received or passed as a part of the consideration of the land. But if it can be shown by satisfactory proof in the case, that the note was obtained from the complainant by such representations, it would give a fraudulent character to the transaction rather than that of a *mistake,* and consequently, as fraud is not charged no relief can be granted on that ground. But admit that this allegation of the bill embraces the charge of a *mistake,* how is it sustained? The testimony on this point rests in parol, and reliance is placed solely upon the frail memory of a single witness, unaided by a single pregnant circumstance in the cause. What is that testimony? *John H. Huyett,* a witness examined on the part of the complainant, represents, that sometime in the year 1844, he asked *Brewer* if it was true that the complainant owed him $1,600? that *Brewer* answered, " do you suppose I have nothing to get," and further remarked, " that he held a claim against his father's estate, for money lent and not satisfied, and had his interest in his father's estate; and that his claim against *Beard* was made up of both of these." This testimony is relied upon in the able and ingenious argument of the complainant's counsel, to show the consideration upon which the note in question was obtained from the complainant, and infers from the facts thus disclosed, that the pretended consideration had no foundation in fact. For how, he very properly inquires, could a note of the complainant discharge a debt due *Beard* from his father's estate, or any portion of his interest in his father's estate? Hence the conclusion is drawn, that the consideration for said note, as represented by *Brewer* to *Huyett,* could not in reason and sound sense be regarded as the true consideration of the said note, and as *Mrs. McRea* in her testimony represents *Brewer* as having stated that his transactions in business with the complainant, were confined exclusively to the purchase

of the land heretofore referred to, the counsel concludes the note in question must have been given on account of the land, and as that had been paid for, the inference was irresistible, that the note was founded in *mistake*.

It has been shown that the testimony of *Mrs. McRea*, from its character, was too uncertain to be relied upon in determining the true character of the case under consideration. It has also been shown that the note could not have been given on account of the land, and was not so understood at the time it was given, either by the complainant or defendant. The value placed upon *Huyett's* testimony, as it stands disclosed in the record, by the complainant's counsel, in the estimation of the court, is just, for it is difficult, indeed, to imagine how a note of the complainant to *Jacob Brewer, of J.*, could be made to discharge a debt due him from his father's estate, or any portion of his interest in his father's estate. But while it is admitted that this testimony does not exhibit any satisfactory evidence of the true consideration of the note, it is equally true it does not furnish any satisfactory evidence that the note itself was founded in mistake. This testimony as it is disclosed in the record, obviously is without meaning, and shows that the true state of the transaction is not to be found in such testimony. If the complainant was a sane man, (and there is no proof in this cause to show he was not,) he could not have given his note for so large a sum of money, upon such a senseless representation. And *Jacob Brewer, of J.*, if he is a man of common understanding, could not have made such a representation to the complainant, with a view of obtaining the note, or to the witness afterwards in attempting to account for the manner in which the note was obtained. To give any importance to such testimony, would involve the sound sense of both complainant and defendant. This conversation of *Jacob Brewer, of J.*, held with *Huyett*, requires explanation, and it is not found in the record. It does not appear that *Huyett* inquired of *Brewer* the meaning he designed to convey by the language he is represented to have employed. If the witness had made the proper inquiry, the true state of the

case might have been unfolded. If he had been asked how such a note could have been made to pay such a debt? *Brewer* might have replied that the estate of *John Brewer,* his father, was indebted to him in some $2000, and that he, *Jacob Brewer,* had advanced this sum out of his father's estate to the complainant, who was in pecuniary difficulty at the time, and that what he meant by stating that this debt was not yet paid, was, that he was not yet in the enjoyment of it, but had advanced it to the complainant to relieve him from pecuniary difficulty. This explanation would have been sensible and satisfactory. This part of the testimony as it stands disclosed, is without meaning, and entirely unsatisfactory to the mind of the court. It is worthy of remark, that both *Mrs. McRea* and *Huyett* state that they know nothing of the money transactions of the complainant and *Jacob Brewer of J.,* except what is contained in the declarations of *Brewer* testified to by them, and neither of them was present when the said note was given. At all events, the whole proof relied upon by the complainant to make out the charge of a mistake, consists in the unaided naked confessions of *Jacob Brewer of J.,* testified to by *Mrs. McRea* and *Huyett,* in the conversations he is represented to have held with them. These confessions are too loose and unsatisfactory, and do not, in the judgment of this court, furnish evidence sufficiently clear, in the language of the courts to prove a *plain, palpable mistake.*

The danger of such testimony, (resting as it does in *parol,*) in unsettling contracts of parties reduced to writing, is clearly illustrated by Chancellor *Kent,* in the case of *Marks vs. Pell,* 1 *John's Ch. Rep.,* 594, in which he says: "Such conversations are extremely liable to be misunderstood, and when unsupported by other facts unsafe to be relied on," &c. Much reliance seems to be placed upon the fact that the complainant was in delicate health during the progress of the settlement of the various estates in the hands of *Jacob Brewer of J.* These estates are admitted by the counsel to be correctly settled. The ill health of the complainant, was not, therefore, any disadvantage to him in this respect. But there is one potent

fact which is adverse to any claim the complainant can have in asking this court to exert its power to grant the relief he invokes. He states in his bill, that on the 15th of March, 1840, the date of the note upon which the judgment in question was rendered he suspected it was not correct. It was further proved that for the last eight years the complainant has been fully able to attend to his business transactions. And yet from the year 1840, to the latter part of the year 1846, during the life of *Jacob Brewer of J.*, he makes no effort to correct any supposed error, or even to intimate his suspicions on the subject. So far from it, he repeatedly, from the 18th of March, 1840, up to the period of *Jacob Brewer's* death, recognised the justice of the said debt in the most solemn manner. Let the decree be drawn dissolving the injunction and dismissing the bill with costs." From this decree the complainant appealed.

The cause was argued before SPENCE, MAGRUDER, MARTIN and FRICK, J.

By GEO. SCHLEY and F. A. SCHLEY, for the appellants, and

By PRICE for the appellee.

MAGRUDER, J., delivered the opinion of this court.

In a case like this the court may not be certain that a complainant is not entitled to any portion of the relief which he asks, and yet may be bound to dismiss his bill. The evidence on which he relies must be satisfactory, indeed, that the mistake which he charges was committed.

More than seven years before the bill was filed, the original complainant gave to the intestate of one of the defendants his note, and shortly afterwards confessed judgment for the amount due on said note. As late as the year 1846, this judgment being en-ed satisfied, a second judgment was confessed for the sum then due.

The language of *Lord Thurlow*, 1*st Brown's Chy. Reports*, 93, may be too strong, but in all such attempts as this it has

been required of the party seeking to be relieved upon the ground of mistake, to produce, if not quite, almost incontrovertible proof, or to use the language of a distinguished chancellor, "proof clear and overwhelming." It cannot be believed that the testimony of *Mrs. McRea* or *Huyett*, is of this description. Both of them tell us that the creditor insisted upon the justice of his claim, though they probably misunderstood, or have forgotten what he said when stating how it originated.

In all such cases as this, it is required that the party, who is injured by a mistake, should take steps promptly to get relief. But the complainant himself says, that when he signed the note he was "not satisfied that he owed the money to said *Brewer*, but he has always entertained misgivings in relation to it," &c. Surely then he has been guilty of great *laches*, and cannot complain if by reason thereof he is a sufferer.

The person, moreover, of whom relief is sought, is not the original creditor, but the individual to whom the judgment was assigned, we must suppose for a valuable consideration. The note and original judgment were given in 1840. A second judgment was confessed in 1845. In 1846 this judgment was assigned to *Snyder* for whose use it was entered. The year following a considerable payment was made to the administrator of *Snyder*, who after all this assigned the judgment to *Hubble* one of the defendants. Is *Hubble* to be deprived of his remedy by execution at law? We cannot think so. Surely these assignees have a superior equity to any that the complainant has been able to show. See *Kemps Exc'x vs. McPherson*, and the cases there cited, 7 *H. & Johnson*, 320.

We think that the learned judge in the court below, has conclusively shown that no relief can be given in this case.

DECREE. AFFIRMED. WITH COSTS.